UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TOM STULL, an individual,

         Plaintiff and
         Counter-defendant,

     vs.

MICHAEL FOX, an individual,

         Defendant and
         Counterclaimant.

CASE NO. CV 09-6081-R

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Following a bench trial on July 6-7, 2010, the Court makes the following Findings of Fact and Conclusions of Law:

**I. PROCEDURAL HISTORY**

    1.    Plaintiff and counterclaim-defendant Tom Stull ("Stull") filed his complaint on July 14, 2009.  Defendant removed to this Court on August 20, 2009. There was no motion to remand.  The complaint asserted five causes of action: three causes of action for breach of alleged oral agreements relating, respectively, to a project in Panama called "Vida Nueva," a project in Costa Rica called "Pacifico Colonial" and a second project in Costa Rica, one cause of action for intentional interference with prospective business relationships, and one cause of

action for common-law unfair competition.

2.      Fox filed an answer and counterclaim on September 28, 2009, denying liability and asserting claims for breach of contract and unjust enrichment arising from an alleged partnership in a Costa Rican real-estate development.  Fox later amended this pleading to correct the description of the alleged partnership to relate to the Vida Nueva project in Panama.

3.      Based on the later stipulation of the parties, Stull's claims for intentional interference with prospective business relationships and unfair competition, and Fox's counterclaim for unjust enrichment, were dismissed without prejudice.

4.      Trial commenced on July 6, 2010.  Both parties waived jury, and the case was tried to the Court.

5.      Prior to resting, Fox moved pursuant to Federal Rule of Civil Procedure 15(b) to amend to conform the pleadings to the proof.  In particular, Fox first noted that the evidence admitted on the contract issues framed by the pleadings and Final Pretrial Conference Order also supported claims for breach of fiduciary duty and breach of duties imposed under the Uniform Partnership Act.

6.      The Court finds that granting the motion to amend to conform to proof will aid in presenting the merits of the claims and legal theories raised by the evidence, and that Stull has not satisfied the Court that permitting the amendment would prejudice his action or defense on the merits of those claims or theories.  The Court therefore granted the motion to amend to conform to proof and will consider the merits of the legal theories and claims and defenses raised by the evidence admitted at trial.

7.      Before resting, Fox offered to introduce additional evidence relevant only to a claim for punitive damages, should the Court find the foundation had been established for such a claim.  In order to expedite and economize, the Court ordered, pursuant to Rule 42(b), that the issue of punitive damages will be considered, if at all, in a separate trial, should one be necessary based on the Court's findings of fact and conclusions of law.

**II. FINDINGS OF FACT**

8.      Fox has been a real estate developer for about 20 years.  (7/7/10 Transcript, p. 6.)

2

9.      In 2006, Fox traveled to Panama on a one-way ticket in order to locate and commence a real-estate development project.  (7/7/10 Transcript, p. 9.)  He located a desirable property on the Pacific coast of Panama, made up of six contiguous parcels totaling about 1,000 acres, all under common ownership.  (7/7/10 Transcript, pp. 10-11.)  After spending a few weeks walking on the land, Fox believed that once the jungle was cleared away it would produce at least three homesites with highly valuable ocean views, and would be an ideal candidate for development.  (7/7/10 Transcript, p. 10.)

10.     Fox negotiated agreements to buy the property, taking title to two of the parcels with owner-financed mortgages and acquiring options to purchase the remaining four parcels at specified purchase prices.  (7/7/10 Transcript, p. 11.)  The total agreed purchase price for the six parcels was $1.2 million, of which Fox made a down payment of $175,000 and the seller financed the rest.  (7/7/10 Transcript, p. 10-11.)  This property is called Vida Nueva.  (7/7/10 Transcript, p. 8.)

11.     Fox began to clear the Mountain portion of Vida Nueva and discovered many lots with spectacular ocean views.  (7/7/10 Transcript, p. 12-13.)  Fox then sold a portion of the Mountain portion of the Vida Nueva property to TCHoldings (sometimes referred to as Terry and Curtis).  (7/7/10 Transcript, p. 14-15.)  The sales price was $360,000, or $3 per square meter.  (7/7/10 Transcript, p. 15.)  Fox then identified 37 lots that could be sold on the remaining Mountain portion of Vida Nueva.  (Ex. 4; 6/7/10 Transcript, p. 48; 6/6/10 Transcript, p. 82.)

12.     During the time he controlled the property, Fox paid off the mortgages to the seller on the two mortgaged Vida Nueva parcels and paid the annual option fees on the four Vida Nueva parcels that were subject to his option rights.  (7/7/10 Transcript, p. 17.)

13.     Fox and some investors formed a company called Global Venture Capital to pursue the development of Vida Nueva.  Fox owned 45% of GVC and the investors owned the remaining 55%.  Fox contributed his rights to Vida Nueva to Global Venture Capital and the investors committed to provide about $1.5 million in funding.  In fact, however, the investors provided only about $500,000 of the promised funding before the downturn in the US real estate market prevented them from providing the remainder of their commitment.  (7/7/10 Transcript, p.

16.)

14.     Fox approached Stull in early November 2007 with a proposal to have Stull lend Fox $350,000 or $500,000 for Fox to continue with the development of Vida Nueva.  (Ex. 5 p. 1.)  Stull arranged to have Kevin Beer ("Beer") travel to Panama to perform due diligence on the Vida Nueva project.  (7/6/10 Transcript, p. 30, 36-37, 81.)

15.     After Beer reported back on his investigation of Vida Nueva, Stull and Fox spoke on the telephone.  Stull said he did not want to make a loan to Fox, but wanted to fund the project, with the two splitting any resulting profits equally.  (7/7/10 Transcript, p. 18, 20.)  It was then agreed that Fox would travel to Stull's home in Santa Ynez, California, to discuss the details of the arrangement.  (7/6/10 Transcript, p. 84.)

16.     The meeting in Santa Ynez occurred in mid-December 2007.  It lasted several hours, and was attended by Fox, Stull and Beer.  (7/6/10 Transcript, p. 84-85.)  The Court finds that the parties entered into an agreement with the following terms:

(a)     Fox will contribute his rights to the Vida Nueva parcels, with Stull agreeing to advance the funds required to (i) buy-out the existing investors in Global Venture Capital, and (ii) pay to the land owner the specified purchase prices of the four parcels on which Fox held options.  (7/6/10 Transcript, p. 62; 7/7/10 Transcript, pp. 18-19.)

(b)     Stull will provide the necessary financing for the development of Vida Nueva and will control the overall development.  (7/6/10 Transcript, pp. 32, 36, 89; 7/7/10 Transcript, p. 20.)

(c)     These advances by Stull will be repaid (plus a 10% interest charge) before any profits are calculated.  After Stull has been paid back, the net profits will be shared by Fox, Stull and Beer.  Beer will receive 10% of the profits, with Stull and Fox sharing the remaining profits equally – i.e., 45% each.  (7/6/10 Transcript, pp. 32-33, 35, 54-55, 87, 89; 7/7/10 Transcript, p. 20.)

(d)     Fox will be in charge of sales and marketing of Vida Nueva.  (7/6/10 Transcript, p. 32, 87; 7/7/10 Transcript, pp. 21, 26.)

(e)     Beer will be in charge of all accounting, administration and construction

4

management.  (7/6/10 Transcript, pp. 32, 33, 70, 78, 87; 7/7/10 Transcript, p. 20.)

(f)     Fox will also be responsible for locating and negotiating other potentially profitable deals.  These will be presented to Stull, who will make the go/no-go decision and provide any necessary advances to close the deals.  (7/6/10 Transcript, p. 33; 7/7/10 Transcript, pp. 20-22.)

(g)     Profits on any other deals will be applied to cover overhead on Vida Nueva. (7/6/10 Transcript, p. 67, 138; 7/7/10 Transcript, pp. 22-23.)

(h)     Stull or a company he controls will acquire legal title to the Vida Nueva property.  (7/6/10 Transcript, p. 86; 7/7/10 Transcript, p. 19.)

(i)     Stull will advance Fox $10,000 per month, and will make a similar monthly advance to Beer, with 110% of those amounts to be repaid either from their respective shares of the profits, or personally if no profits are realized.  (7/6/10 Transcript, pp. 33, 137; 7/7/10 Transcript, pp. 22-23.) In all, Fox received $130,000 in the form of these monthly advances.

17.     The Parties agreed to share any profit generated by Vida Nueva. And, by agreeing to repay Stull's advances and risking the uncompensated contribution of their labor (in addition to any other property rights contributed by Fox), Fox and Beer also shared in the risk of loss. As explained more fully in the Conclusions of Law, these findings lead the Court to also find that the agreement formed a partnership.

18.     The parties generally acted consistently with the above-described partnership agreement and referred to their relationship as a "partnership."  (Ex. 23 p. 2; Ex. 32 pp. 4, 6.)

19.     Stull advanced $1.43 million to the partnership and the partnership made the acquisition of the Vida Nueva parcels in mid-March 2008.  (7/6/10 Transcript, p. 65.)  The partnership agreement provided that Stull would be repaid this $1.43 million (plus the agreed 10% interest factor) from partnership revenues before partnership profits were calculated.

20.     The record establishes that the Vida Nueva property was purchased with partnership assets and was itself a partnership asset.  Even though, in accordance with the parties' partnership agreement, Stull's company held legal title to Vida Nueva, Stull controlled this title

in his capacity as a partner in the Vida Nueva partnership and the property was a partnership asset.

21.     Shortly after the Vida Nueva property was acquired, and in view of Beer's responsibilities, the partners agreed to increase his percentage of the profits to 15% while leaving Fox and Stull as equal partners at 42.5% each.  (7/6/10 Transcript, p. 34-35; 7/7/10 Transcript, p. 20.)

22.     In June 2008, the Vida Nueva partnership entered into a transaction to acquire a 180-acre, 420-lot development in Panama called Boca Chica.  (Exs. 16, 32 p. 3; 7/7/10 Transcript, p. 23.)  The cost to the partnership for the Boca Chica property was $238,000.  (Ex. 300, p. 5.)

23.     Fox pursued several other potential deals in mid-2008, and Stull agreed to do two of them.  (Exs. 32 p. 3, 187; 7/7/10 Transcript, p. 21-22.)  One was a property referred to as Yale Ave., which resulted in a quick $36,000 profit for the partnership.  (Ex. 32 p. 3; Ex. 300 p. 5; 7/7/10 Transcript, p. 21.)  The second was referred to as 16 Michigan lots, and returned a profit of $17,400 to the partnership.  (Ex. 32 p. 3; Ex. 300 p. 5; 7/7/10 Transcript, p. 22.)  In late July, Stull told Fox that, while he "appreciate[d] the hard work [Fox was] doing on these deals," he wanted to emphasize quality deals over quantity, and that what he wants is more deals where the land is worth 3-4 times what they paid, "such as the one we presently have in Panama," referring to Vida Nueva.  (Ex. 187; 7/6/10 Transcript, p. 67.)

24.     Stull asked Fox to get involved in trying to sell condominium units that Stull owned in Costa Rica.  (7/6/10 Transcript, p. 49; 7/7/10 Transcript, p. 25.)  This was separate from the partnership.  (7/6/10 Transcript, p. 50; 7/7/10 Transcript, p. 25.)  Stull advanced $16,000 to cover expenses in connection with this effort.  (7/6/10 Transcript, p. 49.)  The advances were to be repaid from sales commissions. (7/6/10 Transcript, p. 50.) The Court finds that there was no agreement to repay the advance personally in the event that no sales commissions were generated.

25.     The partnership spent $75,462 in deposit and legal fees in connection with a 385-acre parcel in Costa Rica.  (Ex. 300 p. 5; 7/6/10 Transcript, p. 50.)  Beer and Stull ultimately

chose not to conclude a purchase of this property and forfeited the deposit.  (Ex. 183 p. 3; 7/7/10 Transcript, pp. 24-25.)  Although Stull claims that Fox agreed to personally repay the amount spent on this property even if there were no profits, there is no evidence of a discussion on that subject matter and the Court finds that there was no such promise made.  The Court finds that there was no agreement to treat the costs in question any differently from other partnership costs to be borne by the partnership as a whole.

26.     In connection with his responsibilities for Vida Nueva sales and marketing, Fox submitted a budget of $98,000 in start-up costs for a website, magazine ads and a sales office with commissioned sales people.  (7/7/10 Transcript, p. 28.)  Stull approved and advanced the funds for this budget, and the partners agreed that these advances by Stull would be repaid from the 25% sales commission at the rate of $5,000 per lot sold (*i.e.*, the 25% commission would be reduced by $5,000 per lot until Stull was repaid this advance).  (7/7/10 Transcript, p. 28-29.)  Although Stull claims that Fox agreed to personally repay these sales and marketing expenses even if there were no profits, there is no evidence of a discussion on that subject matter.  The Court finds that there was no such promise made, and that the agreement was to treat these expenses like any other partnership costs to be borne by the partnership as a whole.

27.     Once Stull became responsible for decisions concerning the development of Vida Nueva, he decided to increase the number of salable lots in the Mountain portion from 37 lots to 106 lots.  (7/7/10 Transcript, p. 48-49.)

28.     Beer and Stull announced the prices for the 106 lots in November 2008, with the best 20 lots being taken off the market and the remaining lots being graded from "A" to "F," with standard prices ranging from $135,000 per "A" lot to $50,000 per "F" lot.  (Ex. 271 p. 1; 7/7/10 Transcript, p. 43.)  Stull also announced that the first 10 lots to be sold could be discounted by 20% and that the partnership would agree to finance up to 50% of the purchase price for up to two years.  (Ex. 271 p. 1.)  Fox responded that he believed he could sell lots at those prices.  (*Id.*)

29.     On February 18, 2009, Beer sent Fox a memo stating that "Tom and I have decided to move forward on the sales effort on a month by month basis" and listing a number of requirements that Fox was expected to meet in connections with his efforts to sell lots.  (Ex. 88,

emphasis omitted.)  These requirements included that "Kevin/Tom" had to approve any document to be signed by a buyer; that sales commissions would not be paid at the time of sale (as previously told to the commissioned sales staff) but would be delayed 90 days; that there would be no commitment to actually build a marina in the development; and that the net sales price after commissions had to be consistent with the previously approved price list (*i.e.*, Ex. 271).  (Ex. 88; 7/7/10 Transcript, pp. 32-34.)

30.    Stull decided that he did not want to deal with Fox any longer.  He testified that this decision was made in early 2009, but it was not finally communicated to Fox until March 20, 2009.  (Ex. 121; 7/6/10 Transcript, pp. 43-44.)  Beer's email to Fox of that date stated "we have decided to part ways with you, we are no longer interested at dealing with you and any level ….  do not trespass on the property again" and "'Frame' this email and consider it a letter of divorce." (Ex. 121, ellipses in original).

31.    Fox sought to discuss this decision with Stull and insisted that if, after such a discussion, Stull still wanted to part company, Fox would acquiesce but there needed to be a fair and equitable sharing of the partnership assets.  (Exs. 99, 122, 127, 128.)  Except for forwarding one email drafted by Beer, Stull did not respond to these communications.  (7/7/10 Transcript, p. 47.)

32.    By the March 20, 2009 "letter of divorce" (Ex. 121), Stull expressly and unequivocally communicated his refusal to perform or even to recognize his contractual obligations to Fox.  This repudiation, effective March 20, 2009, was then reinforced by Stull's assertion in response to Fox's request for an equitable division of assets that "We consider you paid in full.  Don't call us." (7/7/10 Transcript, p. 47) as well as his subsequent refusals to respond at all to Fox's inquiries.

33.    However, there is not clear and convincing evidence that Stull is guilty of oppression and malice.  Stull did not intend by these actions to cause injury to Fox, and his conduct is not despicable.  Stull did not subject Fox to cruel and unjust hardship in willful and conscious disregard of Fox's rights as a partner. The Court finds that, while he was incorrect in his beliefs and actions, Stull did believe in good faith that he could exercise sole control over the

1    Vida Nueva project and exclude Fox at will. Based on Stull's actions it is clear that it is no longer

2    reasonably practicable to carry on the business venture Vida Nueva as a partnership.

3           34.    The present value of Vida Nueva is highly speculative and the parties did not

4    present any independent valuations of the project by which the Court could properly assess the

5    value of the property or the value of the business venture.

6           35.    Stull asserted ten "affirmative defenses" to Fox's counterclaim.  (Reply to First

7    Amended Counterclaim, docket entry #60.)  Some advance legal arguments that are addressed in

8    the below Conclusions of Law.  Others are equitable in nature and would not affect the legal

9    remedies sought by Fox.  In any event, to the extent evidence was introduced arguably in support

10   of one or more affirmative defenses, the Court is not persuaded that any of them have merit.

11   **III. CONCLUSIONS OF LAW**

12          36.    The Court has subject-matter jurisdiction over the asserted claims based on

13   diversity of citizenship – Stull and Fox are citizens of different states and the amount in

14   controversy exceeds $75,000 exclusive of interest and costs.  28 U.S.C. § 1332(a).

15          37.    "In a diversity case, federal courts apply the substantive law of the forum in which

16   the court is located, including the forum's choice of law rules."  *Downing v. Abercrombie &*

17   *Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001) (internal quote and citation omitted).

18          38.    Oral agreements to jointly engage in a business and share the resulting profits are

19   enforceable as partnership agreements.  *Holmes v. Lerner*, 74 Cal. App. 4th 442, 457 (1999)

20   ("parties who expressly agree to associate as co-owners with the intent to carry on a business for

21   profit, have established a partnership.  Once the elements of that definition are established, other

22   provisions of the UPA [Uniform Partnership Act] and the conduct of the parties supply the

23   details of the agreement"); Cal. Corp. Code § 16101(10) ("'Partnership agreement' means the

24   agreement, whether written, oral, or implied, among the partners concerning the partnership,

25   including amendments to the partnership agreement").

26          39.    "The burden of proving the existence of a partnership lies upon the party asserting

27   its existence."  *Mercado v. Hoefler*, 190 Cal. App. 2d 12, 16 (1961).  Whether or not a

28   partnership agreement was formed is a question of fact.  *Nelson v. Abraham*, 29 Cal.2d 745, 750

(1947) ("Whether the agreement to share profits is merely to provide a measure of compensation for services or for the use of money, or whether it extends beyond and bestows ownership and interest in the profits themselves so as to constitute the undertaking a partnership or a joint venture, presents primarily questions of fact"); *Lusher v. Silver*, 70 Cal. App. 2d 586, 588 (1945) ("In the last analysis the fact of partnership depends upon the intention of the parties.  To determine this intent not only the words of the agreement itself, but the actions and conduct of the parties may be considered").

40.    An oral partnership agreement to jointly develop real estate and share the resulting profits is not made unenforceable by the statute of frauds.  *Kaljian v. Menezes*, 36 Cal. App. 4th 573, 583-84 (1995) (oral partnership agreement to jointly develop real property owned by the defendant and share profits not within statue of frauds); *Lasry v. Lederman*, 147 Cal. App. 2d 480, 488 (1957) (oral agreement to form a joint venture to purchase a building and renovate, lease and sell it; "[s]uch an undertaking by joint adventurers is not within the purview of the statute of frauds").

41.    The parties to a partnership agreement have considerable freedom to define their rights and obligations among themselves and between the partners and the partnership.  Cal. Corp. Code § 16103(a) ("Except as otherwise provided in subdivision (b), relations among the partners and between the partners and the partnership are governed by the partnership agreement").  Notwithstanding this freedom, the partnership agreement may not unreasonably restrict the fiduciary duties each partner owes to the other partners and to the partnership.  Cal. Corp. Code §§ 16103(b)(3), (4) and (5); *Everest Investors 8 v. McNeil Partners*, 114 Cal. App. 4th 411, 424 (2003) ("The fiduciary obligations of a general partner with respect to matters fundamentally related to the partnership business cannot be waived or contracted away in the partnership agreement").

42.    Where the partnership agreement is silent, the Uniform Partnership Act will define the rights and obligations among partners and between the partners and the partnership.  Cal. Corp. Code § 16103(a) ("To the extent the partnership agreement does not otherwise provide, this chapter governs relations among the partners and between the partners and the

10

partnership"); *Holmes v. Lerner*, 74 Cal. App. 4th 442, 457 (1999) (once a partnership is established, "other provisions of the UPA [Uniform Partnership Act] and the conduct of the parties supply the details of the agreement").

43.     In the absence of a contrary agreement on the point, the partners will be deemed to have agreed to share losses in the same proportion that they have agreed to share profits.  Cal. Corp. Code § 16401(b) ("Each partner is entitled to an equal share of the partnership profits and … is chargeable with a share of the partnership losses in proportion to the partner's share of the profits"); *Holtz v. United Plumbing & Heating Co.*, 49 Cal. 2d 501, 507 (1957) (although "the matter of losses apparently was never discussed," a joint venture was not thereby defeated because "an understanding as to the division of the profits ordinarily carries with it, in the absence of an express agreement to the contrary, an implied obligation to share losses in the same proportion"). Additionally, while the parties did not frame the agreement to repay Stull's monthly advances as an agreement to share losses, Fox and Beer did share in the risk of loss to the extent of their advances and their respective contributions of labor and other property rights.

44.     The partners are permitted by agreement to allocate management and control responsibilities among themselves, even to the extent of vesting all such control in one of the partners.  *Singleton v. Fuller*, 118 Cal. App. 2d 733, 741 (1953) ("The fact that no complete control of any part of a partnership venture is vested in each partner does not negative the existence of a partnership since, by agreement, one partner may be given the duty of management of the enterprise or any part thereof"); *Dills v. Delira Corp.*, 145 Cal. App. 2d 124, 132 (1956) (partnership may exist "when persons jointly associated agree that management of the enterprise be entrusted to one of the group").  In any event, as discussed in the Findings of Fact, the parties' agreement allocated responsibility among the three partners, including allocating to Fox the responsibility for sales and marketing.

45.     The Uniform Partnership Act provides rules for determining whether a partnership has been formed, including the rule relevant to the present case that a person who agrees to carry on a business jointly with others and share profits is presumed to be a partner in the business:

A person who receives a share of the profits of a business is

11

1          presumed to be a partner in the business, unless the profits were

2          received for any of the following reasons:

3          (A) In payment of a debt by installments or otherwise.

4          (B) In payment for services as an independent contractor or of

5          wages or other compensation to an employee.

6          (C) In payment of rent.

7          (D) In payment of an annuity or other retirement benefit to a

8          beneficiary, representative, or designee of a deceased or retired

9          partner.

10         (E) In payment of interest or other charge on a loan, even if the

11         amount of payment varies with the profits of the business, including

12         a direct or indirect present or future ownership of the collateral, or

13         rights to income, proceeds, or increase in value derived from the

14         collateral.

15         (F) In payment for the sale of the goodwill of a business or other

16         property by installments or otherwise.

17  Cal. Corp. Code § 16202(c)(3).

18      46.    "Property acquired by a partnership is property of the partnership and not of the

19  partners individually."  Cal. Corp. Code § 16203.  "Property is presumed to be partnership

20  property if purchased with partnership assets, even if not acquired in the name of the partnership

21  or of one or more partners with an indication in the instrument transferring title to the property of

22  the person's capacity as a partner or of the existence of a partnership."  Cal. Corp. Code §

23  16204(c).  *See also In re Fair Oaks Ltd.*, 168 B.R. 397, 402 (9th Cir. BAP 1994).  Moreover,

24  "[p]artnership property also does not need to be purchased with partnership funds but rather

25  partnership property is determined by the understanding and intention of the partners."  *Id.*

26      47.    Stull states that "Mr. Fox' profit sharing was contemplated only as compensation

27  for services rendered by Mr. Fox," which Stull argues is inconsistent with a partnership.  (Stull's

28  Proposed Findings, Conclusion of Law ¶ 2.)  As discussed in the Findings of Fact, the advances

are not properly characterized as compensation because of the attending obligation to repay them in the event no profits were realized.

48.     "Anticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract.  The repudiation may be express or implied.  An express repudiation is a clear, positive, unequivocal refusal to perform; an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible."  *Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975) (citations omitted); *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1130 (C.D. Cal. 2002) ("An anticipatory breach occurs when a party expressly and unequivocally refuses to perform, or when its conduct places the party in a position where is cannot substantially perform").

49.     "When a promisor repudiates a contract, the injured party faces an election of remedies: he can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time."  *Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975); *Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 489 (1996); *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1131 (C.D. Cal. 2002).

50.     The Uniform Partnership Act defines a number of situations under which a partner can be disassociated from a partnership.  Cal. Corp. Code § 16601.

51.     The possible grounds for disassociation under Cal. Corp. Code § 16601 based on expulsion of a partner are subsection (3) ("expulsion pursuant to the partnership agreement"), subsection (4) ("expulsion by the unanimous vote of the other partners" where it is "unlawful to carry on the partnership business with that partner" or the partner's interest has been transferred or is subject to a judicial charging order), and subsection (5) ("expulsion by judicial determination" based on misconduct by the partner).  None of these circumstances apply.  Contrary to Fox's argument, he was not expelled by unanimous vote of the other partners, but by Stull exercising what he believed was his unilateral right to expel Fox at will.

52.     While Fox has not been dissociated within the meaning of Cal. Corp. Code §

13

16701(a), it is clear that it is no longer reasonably practicable to carry on the business venture Vida Nueva as a partnership. As such, the partnership is dissolved, and its business shall be wound up. *See* Cal. Corp. Code § 16801(5)(B)&(C); *Navarro v. Perron*, 122 Cal. App. 4th 797, 802 (2004).

53.    "The relationship between copartners, or between joint adventurers, is of a fiduciary character."  *Nelson v. Abraham*, 29 Cal. 2d 745, 750 (1947).  See also, *City of Hope Nat. Medical Center v. Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008) (partnership and joint venture are among the relationships that impose the "fiduciary obligation to act on behalf of and for the benefit of another as a matter of law") (paraphrasing marks and internal quote omitted). "Partnership is a fiduciary relationship, and partners are held to the standards and duties of a trustee in their dealings with each other."  *BT-I v. Equitable Life Assurance Society*, 75 Cal. App. 4th 1406, 1410 (1999); *Everest Investors 8 v. McNeil Parnters*, 114 Cal. App. 4th 411, 424 (2003); *Bardis v. Oates*, 119 Cal. App. 4th 1, 12 (2004); *Enea v. Superior Court*, 132 Cal. App. 4th 1559, 1565 (2005); *In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1109, 1133 (C.D. Cal. 2002).  Courts have imposed fiduciary duties on partners in partnerships before the adoption of the Uniform Partnership Act, and existing case law concerning the scope of such duties continues to be good law.  *BT-I v. Equitable Life Assurance Society*, 75 Cal. App. 4th 1406, 1410-11 (1999); *Pellegrini v. Weiss*, 165 Cal. App. 4th 515, 524-25 (2008).

54.    "The elements of a cause of action for breach of fiduciary duty are: 1) the existence of a fiduciary duty; 2) a breach of the fiduciary duty; and 3) resulting damage."  *Pellegrini v. Weiss*, 165 Cal. App. 4th 515, 524 (2008).

55.    "For the breach of an obligation arising from contract, the measure of damages … is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."  Cal. Civil Code § 3300.

56.    "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been

anticipated or not."  Cal. Civil Code § 3333.

57.    "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."  Cal. Civil Code § 3294(a).  In this context, "'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  Cal. Civil Code § 3294(c)(1).  "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.  Cal. Civil Code § 3294(c)(2).  "'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."  Cal. Civil Code § 3294(c)(3).

## IV. DISPOSITION

58.    Stull has not persuaded the Court of the existence or breach of the contracts he asserts.  Fox is entitled to judgment on those claims.

59.    Fox has established a partnership agreement that was repudiated by Stull on March 20, 2009.

60.    Fox has not established that he was disassociated from the partnership as of March 20, 2009.  Because (i) Fox was not disassociated, (ii) the parties did not provide any independent valuations of the property or partnership, and (iii) continuing the partnership is no longer reasonably practicable, the Court orders the winding up of the partnership in accordance with the California Uniform Partnership Act of 1994 and pursuant to California Corporations Code section 16801(5)(B)&(C). Once the partnership is wound up, the profits will be distributed in accordance with the agreement of the parties and this Court's findings.  That is, Stull shall be repaid his advances ($1.43 million to purchase the property; any monthly advances to Fox and Beer; the cost of purchasing the Boca Chica property; the deposit on the 385-acre parcel in Costa Rica; the advance on marketing costs associated with the Vida Nueva property) plus 10%

1    interest. Any remaining amount shall be apportioned with Stull and Fox receiving 42.5% and

2    Beer receiving 15%. Any partner may apply for judicial supervision of the winding up. *See* Cal.

3    Corp. Code § 16803(a).

4        61.    Stull breached his fiduciary duties to Fox.  But, in breaching his duties, Stull was

5    not guilty of malice or oppression. Fox will be adequately compensated for Stull's breach when

6    the partnership is wound up and he receives his distribution of any profits.

7    Dated:  October 4, 2010.

8

9

10                                   _____
                                                    MANUEL L. REAL
11                                          UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28